## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

GREGORY L. DAVIS,

      Plaintiff,

      v.

RAY MABUS, *in his official capacity as Secretary of the Navy*,

      Defendant.

Civil Action No. TDC-14-0148

## MEMORANDUM OPINION

Plaintiff Gregory L. Davis worked as a photographer for the United States Navy for less than a year before the Navy terminated his employment on June 29, 2012. Davis claims that his termination violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34 (2012), and constituted unlawful sex discrimination and retaliation under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e–17 (2012). Presently pending before the Court is a Motion for Summary Judgment ("Motion") filed by Defendant Secretary of the Navy Ray Mabus ("the Navy") on June 18, 2015. The Motion is fully briefed, and no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion is GRANTED.

## BACKGROUND

The following facts are either undisputed or presented in the light most favorable to the nonmoving party.

## I.      Hiring

In March 2011, the Naval Test Wing Atlantic ("NTWL") decided to hire a senior scientific/technical photographer to serve at Naval Air Station Patuxent River in St. Mary's County, Maryland to provide "photographic support of aircraft design, development and test programs" and expert advice on photographic data. Position Description, Def.'s Renewed Mot. Summ. J. ("Mot. Summ. J.") Ex. 5, at 2, ECF No. 35-8.[1]  On October 11, 2011, Gerard Garay, the Technical Director of NTWL's Air Test and Evaluation Squadron Two Three ("VX-23"), hired Davis, who turned 40 years old in November 2011, as the photographer.  Davis was not the first choice for the job.  Garay's first choice was a different man, Noel Hepp; his second choice was a younger woman, Kelly Schindler, who ultimately served as a contract photographer alongside Davis.  Because of civil service rules providing a hiring preference for veterans, Garay was required to select Davis, who is a veteran, if he was deemed qualified.  Garay had initially concluded that Davis was not qualified for the position because he did not have one year of specialized experience.  However, when the Human Relations Office disagreed and determined that Davis was qualified for the job, Garay selected Davis rather than hire no one at all. According to Davis, on his first day the facilities manager pulled him aside to tell him that Garay would try to terminate him because he had wanted to hire Schindler.

## II.     Alleged Discrimination

Davis was the only NTWL flight photographer employed by the federal government to support VX-23.  Pursuant to government contracts, however, NTWL also used the services of two contract flight photographers:  Schindler, a 30-year-old woman employed by one of the

---

[1]  Citations are to the page numbers in the original documents.  When exhibits do not have page numbers, or contain multiple sets of page numbers, citations are to the page numbers assigned by the Court's CM/ECF filing system.

Bowhead government contractor companies, and Elizabeth Wolter, a 27-year-old woman employed by Wyle Laboratories. Davis's position description stated that he would serve as "team leader for the supporting photographers convened to support tests." Position Description at 3. Although Davis sought to exercise oversight responsibility over Schindler and Wolter, Garay repeatedly instructed him not to try to supervise them. For example, on November 21, 2011, after Davis e-mailed Garay reporting that Schindler had not responded to his request for information from which he could "keep track of when she last flew," Garay e-mailed Davis to direct him not to track the contractors' flight time, stating "you're out of your 'swim lane.'" Conduct E-mails, Mot. Summ. J. Ex. 9, at 2–3, ECF No. 35-12. Garay explained: "You're not a supervisor of either of these ladies, nor do they fall under our commands. Rather, they support us, both in different fashions." *Id.* at 2. According to Garay, the reference to team leader in the position description "was an outdated remnant of the position when there were multiple government photographers within one organization," and he never intended for Davis to assume that role over the contract photographers. Garay Decl., Mot. Summ. J. Ex. 2, ¶ 21, ECF No. 35-5 (emphasis in original).

During Davis's employment, he was both literally and figuratively distant from Garay. Physically, Davis worked alone in a "transient building" that was "a smaller metal construction building," some distance from the building where Garay was located, ostensibly because it was the only space available that could house Davis and the computers, monitors, printers, and scanners used in photographic processing. Garay Dep., Pl.'s Opp'n Def.'s Renewed Mot. Summ. J. ("Opp'n") Ex. 4, at 25–26, ECF No. 40-6; Garay EEO Decl., Opp'n Ex. 9, at 7 & 9, ECF No. 40-11. During the same time period, Wolter worked outside the base at Wyle's offices.

Schindler worked on base in the Visual Information Department, where she also performed other contractor duties.

Professionally, Davis had little to no relationship with Garay. During his tenure with NTWL, Davis met with Garay approximately four times. By contrast, Davis observed that Garay and Schindler had a close relationship. Davis frequently saw Schindler's car parked outside of Garay's office. Wolter, who used to work at Bowhead with Schindler, viewed Schindler as someone who "would often, and successfully, be friends with the supervisor, or the supervisor role [and] would then, in turn, get her way," such as by being invited to "meetings that she did not necessarily belong at." Wolter Dep., Opp'n Ex. 6, at 54-55, ECF No. 40-8. Schindler frequently missed or was late to briefings with no apparent consequence.

According to the Rules of Engagement for flight photography, assignments to conduct ground or test photography were supposed to be made in the following priority order: Davis, Wolter, Schindler. High visibility Public Affairs Office ("PAO") assignments were to be given first to Schindler because of the nature of her contract, to be followed by Davis, then Wolter. Assignments were made by the staff of the VX-23 Operations Department, but the flight schedules were subject to Garay's approval. Over time, Davis believed that he received progressively fewer and less desirable flight photography assignments than Schindler and Wolter. Garay has acknowledged that although Davis was originally prioritized, at the end of March 2012, Garay requested that the Operations Department make assignments equally among all three photographers, he claims, to ensure that they all had enough flight time to stay proficient. The photographers received a bonus known as "flight pay" for each flight they undertook. Schindler Dep., Opp'n Ex. 5, at 68, ECF No. 40-7. All told, however, from

4

November 2011 until Davis's termination, Davis received 55.2 flight hours, Wolter had 44.9 hours, and Schindler received 15.9 flight hours.

On February 27, 2012, Davis contacted the Naval Air Warfare Center Aircraft Division ("NAWCAD") Equal Employment Opportunity ("EEO") Office and expressed concern that he might be fired "so that a woman could take his position." Davis EEO E-mails, Opp'n Ex. 21, at 2, ECF No. 40-23.

On April 27, 2012, Garay received an e-mail from the NAWCAD Communications Director raising concerns that Davis may have released a photograph publicly without authorization. After exchanging e-mails with the public affairs officer who identified the issue, Garay sent Davis an e-mail on May 15, 2012 informing him that the PAO had reported to him about this matter and reminding him of the photo release policy.[2] Having received this negative feedback from Garay, Davis contacted the NAWCAD EEO Office the next day, on May 16, 2012. An EEO counselor then conducted a preliminary telephone interview with Davis on May 19, 2012, in which Davis alleged that he had been discriminated against based on age and that he was being subjected to a hostile work environment. The EEO Office had another telephone interview with Davis on May 31, 2012.

After Davis contacted the EEO Office on May 16, 2012, Garay took several actions that Davis perceived as retaliatory. On June 19, 2012, in response to an e-mail Schindler sent Garay seeking clarification on Davis's role, Garay wrote, "no one is a team lead or supervisor here." Schindler E-mails, Opp'n Ex. 11, at 2, ECF No. 40-13. On June 20, 2012, Garay directed him to create a log to allow the contract photographers to sign out government photographic equipment that they had not previously used. Then on June 25, 2012, Davis was locked out of the building

---

[2]    Ultimately, it was determined that Davis had not violated the photo release policy, and the Navy does not rely on that incident as a basis for Davis's termination.

in which he worked and was only able to enter after a security officer let him in. Finally, on June 28, 2012, Davis was presented with a termination letter, to be effective the next day. Davis filed a formal EEO complaint alleging age and sex discrimination by Garay on August 15, 2012.

## III.   Performance Evaluations

Throughout his employment, Davis was the subject of consistent negative feedback from others. Shortly after conducting a new hire indoctrination training with Davis on October 12, 2011, Garay began to receive mixed feedback regarding Davis's performance and conduct. Several Operations Department employees and aircrew personnel told Garay that Davis was "difficult to work with," "acted in an arrogant manner," "tried to direct them," and "acted like a 'know it all.'" Garay Decl. ¶ 29. For example, a former NAWCAD Director of Communications told Garay that Davis inappropriately sought to direct the contract photographers' activities. On November 21, 2011, Garay e-mailed Davis about this issue stating "you're out of your 'swim lane.'" Conduct E-mails at 2–3.

On December 6, 2011, after Garay solicited more feedback about Davis's workplace conduct, a VX-23 Executive Officer e-mailed to Garay that Davis "showed up late for his first flight (I was NOT happy)" and that Davis was "a little too salty," but that he may be changing. *Id.* at 4. The Executive Officer also reported, however, that Davis's "[s]tock went up" for helping to print pictures, but that the results are "TBD." *Id.* Others also weighed in. An Assistant Operations Officer informed Garay that Davis had been attempting to circumvent the scheduling process in order to receive more flying time. A former Commanding Officer of VX-23 found Davis "overly-confident, pushy and abrasive." Garay Decl. ¶ 7. And a test pilot complained that Davis was arrogant and difficult, and that Davis had been telling him what to do.

On December 7, 2011, Garay met with Davis to communicate this feedback to him. Garay told Davis that there was a mix of good and bad comments, which included that he was too arrogant, tried to direct personnel in Operations, and that he did not work well with others. Garay also reminded Davis that he was not the supervisor or team lead to anyone. After the meeting with Davis, however, Garay continued to hear similar negative feedback about Davis, including from the same former Commanding Officer of VX-23.

On January 24, 2012, Garay again met with Davis to discuss his performance and conduct. Garay told Davis that although his work product was good, Garay was still getting comments that he was trying to direct others, that he was pushing to get more flight time, and that he was too arrogant. Garay reiterated to Davis that he was not a supervisor or team lead.

From February to April 2012, Garay received additional negative feedback relating to Davis, which he documented in an internal set of notes. In addition to the same issues discussed previously, Garay heard that Davis was trying to "back door" processes. Feedback Notes, Mot. Summ. J. Ex. 10, at 3, ECF No. 35-13. Garay also observed that Davis was no longer interacting much with others and was not forming professional relationships with others. The PAO classified his work as "average/marginal." *Id.* at 3.

In addition to receiving this negative feedback, Garay also believed that Davis had tried to get photographs cleared for public release that were only meant for internal use. On February 2, 2012, Garay sent an e-mail to reiterate to Davis that photographs should only be sent to the PAO release process if they are to be considered for public release. In an e-mail to Davis on February 23, 2012, he observed: "This is a flight test photography billet, not a PAO billet, it just seems like you spend a lot of time focusing on the PAO aspects of the job." Conduct E-mails at 9.

## IV.    Termination Process

Although Davis was terminated in June 2012, the initial discussions relating to possible termination began over six months earlier. On November 21, 2011, following some of the initial negative feedback about Davis, Garay e-mailed Jennifer Hurtt, a human resources specialist, to ask what was required to dismiss a new employee who was still in the probationary period. In the federal government, new employees are on probationary status for one year, meaning that they may be terminated without the full array of civil service protections. *See* 5 C.F.R. §§ 315.802-315.806 (2016). Hurtt responded: "It is recommended that you sit the employee down to discuss the problem and ensure that they know what is expected of them. If from there you continue to have the problem, you can let us know and we can assist with the removal." H.R. E-mails, Mot. Summ. J. Ex. 18, ECF No. 35-21.

On April 10, 2012, Garay e-mailed his supervisor a summary of Davis's performance issues. Garay's supervisor responded, "I personally think we should move in another direction, but it's your call as his supervisor. I don't like the idea of having someone around that's going to be disruptive." Supervisor E-mails, Mot. Summ. J. Ex. 12, at 2, ECF No. 35-5. Garay wrote back that he agreed. On April 19, 2012, Garay e-mailed Hurtt, the same human resources specialist he contacted in November 2011, to set up a time to discuss how to terminate Davis during his probationary period. On May 9, 2012, the Labor and Employee Relations Office directed Hurtt to draft the termination letter. On May 14, 2012, Hurtt sent a draft letter to the Labor and Employee Relations Office, which submitted it to the Office of Counsel for legal review on May 15.

On June 8, 2012, Garay received Davis's termination letter from Hurtt. On June 11, 2012, the EEO Office contacted Garay to notify him that Davis had filed an informal complaint.

After editing the letter, Garay e-mailed it back to Hurtt on June 13, 2012. The termination letter was presented to Davis on June 28, 2012 and became effective on June 29, 2012. Garay's government photographer position was not filled, but a few months later NTWL retained another contract flight photographer, a 48-year-old man, to take over some of the work performed by Davis.

## DISCUSSION

### I.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Felty v. Grave–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

## II.    Age and Sex Discrimination

In Counts I and II, Davis alleges discrimination on the basis of age and sex in violation of the ADEA and Title VII. Under the ADEA, employers may not discriminate against individuals because of their age, 29 U.S.C. § 623(a)(1), while Title VII prohibits employment discrimination on the basis of sex, 42 U.S.C. § 2000e-2(a). Both statutes require a plaintiff to establish a claim through one of two methods. The plaintiff may either demonstrate through direct or circumstantial evidence that sex or age "motivated the employer's adverse employment decision," *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004), or the plaintiff may proceed through the approach espoused in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), "under which the employee, after establishing a *prima facie* case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually pretext for discrimination," *Hill*, 354 F.3d at 285. Davis alleges no direct evidence that his adverse employment action was based on his age or sex and does not rely on this method in opposing the Motion. He therefore must establish his case through the *McDonnell Douglas* framework.

### A. *Prima Facie* Case

A *prima facie* case of discrimination requires a showing that the plaintiff: (1) is a member of a protected class; (2) was performing at a level that met the employer's legitimate expectations at the time of the adverse employment action; (3) suffered an adverse employment action; and (4) was replaced by a similarly qualified individual from outside the protected class, or the position remained open after the plaintiff's termination. *See Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011); *Hill*, 354 F.3d at 285. The Navy does not contest that the first and third prongs are satisfied. On the third prong, Davis acknowledges that the only adverse employment

action he suffered was his termination. *See* Pl.'s Resp. Opp'n to Def.'s Mot. Dismiss or Alternative Summ. J., at 11, ECF No. 12.

On the second prong, whether Davis was performing at a level that met the Navy's legitimate expectations at the time he was terminated, Davis has identified sufficient evidence to create a genuine issue of material fact. Among the major duties for the senior scientific/technical photographer position are taking photographs of tests occurring on land, at sea, or in the air; planning for photographing tests; photographic design; photographic analysis; and consulting on photographic technology. Position Description at 2–3. Davis has produced evidence from which a reasonable jury could conclude that he met the Navy's legitimate expectations relating to these duties. Davis's photographs were printed on the front page of the *Tester* newspaper and posted on the NAVAIR website, suggesting that his "knowledge of the principles and practices of scientific and technical photography" was satisfactory. *Id.* at 4; *Tester*, Opp'n Ex. 18, ECF No. 40-20; Naval Air Systems Command Website, Opp'n Ex. 19, ECF No. 40-21. A senior flight test photographer e-mailed Garay to report that Davis had provided support on short notice, "was essentially 'plug and play' based on his experience," had generally "established a good working relationship" with him, and had "stepped up and helped us out two Saturdays in a row." Wolfe E-mail, Opp'n Ex. 16, at 2, ECF No. 40-18.

The Navy counters by recharacterizing the Navy's legitimate job expectations for Davis. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 515–16 (4th Cir. 2006) ("[B]ecause a plaintiff must show by a preponderance of the evidence that he met the employer's legitimate job expectations to prove his *prima facie* case, the employer may counter with evidence defining the expectations as well as evidence that the employee was not meeting those expectations."). The Navy contends that the issue with Davis was not that he was a poor photographer, but that

Davis's personality, namely that he was "arrogant" and "difficult to work with," was unsatisfactory. Garay Decl. ¶ 29. However, Davis has identified some countervailing evidence on this issue, including an e-mail from an aircrew member who reported to Garay that Davis "was great and quite professional," and that while he "heard that [Davis] was maybe a pain and thought he was in charge of things," those allegations "proved to be untrue." Struck E-mail, Opp'n Ex 17, at 2, ECF No. 40-19. Notably, the Navy has not identified any formal standard of conduct that Davis failed to meet. Under these circumstances, the Court will not find that Davis has failed, for purposes of establishing a *prima facie* case, to create a genuine issue of material fact on whether Davis met the Navy's legitimate expectations.

Although neither party addresses the fourth prong, that the position remained open or was filled by a similarly qualified individual from outside the protected class, there is no evidence that Davis was replaced by a woman or person under age 40. Courts cannot assume that the position remained open or was filled by a similarly qualified individual from outside the protected class; it is the plaintiff's burden at this stage to produce evidence to that effect. *See Hill v. Southeastern Freight Lines, Inc.*, 523 F. App'x 213, 216–17 (4th Cir. 2013) (granting summary judgment based on failure to meet the fourth prong). In fact, the Navy has offered undisputed evidence, through Garay's Declaration, that Davis's duties were taken over by a 48-year-old male photographer working on a part-time contract. Because this replacement photographer was a contractor and not a federal employee, however, Davis's government position, as a technical matter, was not backfilled. Thus, although the fact that the Navy did not replace Davis with a woman or a man under age 40 is strong evidence in the Navy's favor, the fourth prong was technically satisfied because the Davis's position remained open. *See Bonds*, 629 F.3d at 386. The Court therefore finds that, viewing the evidence in the light most favorable

to Davis, there is at least a genuine issue of material fact whether he has established a *prima facie* case of discrimination.

### B. Legitimate, Nondiscriminatory Reason

Although Davis has stated a *prima facie* case for discrimination, the Navy has satisfied the next step in the *McDonnell Douglas* test by providing evidence of a legitimate, nondiscriminatory reason for Davis's termination. *See Hill*, 354 F.3d at 285. Even viewing the evidence in the light most favorable to Davis, there is ample evidence to show that Garay terminated Davis not for discriminatory reasons, but because of his abrasive and disruptive personality.

From approximately November 2011 to April 2012, Garay consistently received negative feedback, which he documented contemporaneously, that flight crews and others working with Davis found him "too arrogant," believed that he "doesn't work well with others," and thought that he generally acted like a "know it all." Garay Decl. ¶¶ 28–38; Feedback Notes at 2–3. Garay also heard reports, including from a test pilot, that Davis would try to direct Operations personnel. He heard from the NAWCAD Director of Communications and from the lead official for the Wyle Laboratories Aircrew contract that Davis "regularly attempted to inappropriately direct the contractor flight photographers" who, pursuant to their contracts, did not report to Navy personnel. Garay Decl. ¶ 30. Although Davis's position description stated that he would be the "team leader for the supporting photographers," Position Description at 3, during his tenure there were no other Navy photographers, so he necessarily did not have any formal supervisory responsibilities. Garay also received reports that Davis tried to "back door" processes, such as by circumventing the scheduling process to get more flying time. Feedback Notes at 3; Garay Decl. ¶ 33. Finally, Garay had observed that on several occasions, Davis

sought to gain clearance for public release of photographs that were intended for internal use only. Garay counseled Davis on these issues in feedback sessions on December 7, 2011 and January 24, 2012.

Although a declaration of the terminating official submitted in support of a motion for summary judgment should be viewed with caution, *see Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998), Garay's account is corroborated not only by his contemporaneous notes throughout this time, but by his e-mails with Davis and his own supervisors prior to the termination. On November 21, 2011, after Davis e-mailed Garay reporting that Schindler had not responded to his request for information from which he could "keep track of when she last flew," Garay directed him not to track the contractors' flight time, stating "you're out of your 'swim lane.'" Conduct E-mails at 2–3. Garay explained: "You're not a supervisor of either of these ladies, nor do they fall under our commands. Rather, they support us, both in different fashions." *Id.* at 2. In a December 16, 2011 e-mail to a VX-23 officer, Garay wrote that two other officials "had similar comments along the lines of 'ok in [aircraft], but a bit too abrasive/fwd/knows it all." *Id.* at 5. Then on February 2, 2012, Garay sent an e-mail to reiterate to Davis that photographs should be sent to the PAO only if they are to be considered for public release. In an e-mail to Davis on February 23, 2012, he observed: "This is a flight test photography billet, not a PAO billet, it just seems like you spend a lot of time focusing on the PAO aspects of the job." *Id.* at 9.

Garay's account is further corroborated by the direct statements of other personnel. On December 6, 2011, a VX-23 Executive Officer e-mailed Garay that he was unhappy that Davis "showed up late for his first flight" and further noted that he "is a little too salty, but I think that is changing." *Id.* at 4. One of the contract photographers, Schindler, who worked alongside

14

Davis testified that she tried to interact with Davis "as little as possible." Schindler Dep. at 51. The other contract photographer, Wolter, noted that she received "between 10 and 20" complaints about Davis, including that he came across as "demanding and pushy," was "demanding for flights, flight time" and that he would often emphasize how the Air Force did things rather than the Navy. Wolter Dep. at 34–37. She further stated that "Davis was a very passionate person, who often shared ideas and had opinions, very opinionated, which can be a good thing and bad thing, depending on the situation. Sometimes that passion can be too overwhelming." *Id.* at 46.

With this evidence, the Navy has articulated a legitimate, nondiscriminatory reason for terminating Davis:  his disruptive and abrasive personality.

### C. Pretext

In the face of such a legitimate, nondiscriminatory reason for termination, the burden then shifts to Davis to show that this articulated reason was not the true reason, but was instead a pretext for discrimination. *See Holland v. Washington Homes Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). To do so, he must show (1) that Garay's stated reasons for terminating Davis were false and (2) those stated reasons were a pretext for discrimination. *See id.* Even viewing the evidence in the light most favorable to Davis, there is insufficient evidence for a reasonable jury to find for Davis on either point.

First, Davis does not appear to have met his burden to show that the proffered nondiscriminatory reason for firing him was false. To do so, Davis needed to provide evidence to raise a genuine issue of material fact on whether Garay "honestly believed" that Davis should be discharged for his abrasive personality. *See Holland*, 487 F.3d at 217 (affirming grant of summary judgment because the plaintiff's evidence failed to address whether the decisionmaking

official "honestly believed" that the plaintiff deserved to be discharged for a nondiscriminatory reason). Davis offered evidence that at least one other official viewed him as a good photographer with a good work ethic. Specifically, he provided a December 21, 2011 e-mail in which another photographer praised Davis for assisting "two Saturdays in a row," for having sufficient experience that made him able to "plug and play," and for establishing a "good working relationship." Wolfe E-mails at 2. The same official sent a similar e-mail, praising Davis's "high quality" photography and "can do attitude in stepping up and helping our test team out at the 11th hour" on May 15, 2012, after the termination decision had already been made. *Id.* at 4. However, Davis's photography skills and his willingness to take on extra flights are not in dispute. Thus, this evidence does not refute the significant evidence that he was terminated for his abrasive personality and inability to work well with others.

On the issue of Davis's personality, Davis offers his Performance Appraisal Form that indicates that he will be judged on factors such as "[w]orking effectively in groups" and maintaining "cooperative and effective . . . working relationships," but the form simply alerted him to the criteria on which he would be judged; it did not provide any ratings. Performance Appraisal Form, Opp'n Ex. 15, at 2, ECF No. 40-17. He also offers an e-mail in which an aircrew member reported to Garay in December 2011 that Davis was "great and quite professional" and that although he had heard that Davis might be "a pain and thought he was in charge of this," "that proved to be untrue." Struck E-mail at 2. When compared to the numerous negative comments received by Garay, described above, this single opinion is likely insufficient to support a finding that Garay did not honestly believe that Davis should be terminated because of his arrogance, propensity to tell others what to do, and inability to get along with others. *See*

*DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("It is the perception of the decision maker which is relevant."); *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980) (same).

Even if such limited positive views about Davis could create a genuine issue of material on whether Garay's stated reason for termination was false, the only plausible alternative reason would be that Garay wanted to terminate Davis because he never wanted to hire him in the first place and only did so because of the veteran's preference requirement. Davis alleges that Garay was seeking to get him fired from the very beginning, and the fact that Garay inquired in November 2011, only a month after hiring Davis, about how to terminate a probationary employee, would tend to support that theory. But Davis has not provided sufficient evidence to support a finding that the stated reason for termination was a pretext for age or sex discrimination. *See Holland*, 487 F.3d at 214. Davis has not offered any evidence that Garay made derogatory remarks about men or older workers. There is no evidence, either in the original hiring of Davis or in the aftermath of his termination, that Garay specifically wanted to install a woman or a young person in that role. Although Davis asserts that Garay wanted to hire Schindler, based only on an inadmissible hearsay statement by another VX-23 employee to that effect, an e-mail sent during the hiring process establishes conclusively that Garay's first choice for the position was a man named Noel Hepp, and that Schindler was his second choice. Hiring E-mails at 3. Moreover, although Davis's federal position was not filled after his termination, it is undisputed that the contractor brought in to take over his duties was a 48-year-old man.

Davis attempts to show that the stated reason for his termination, his failure to get along with others, was a pretext for age or sex discrimination by showing that (1) Garay had voiced and exhibited a preference for younger, female personnel, and (2) Davis was treated less

favorably than his younger, female contract photographer counterparts. The evidence on both points is lacking.

First, Davis claims that Garay had a clear preference for younger, female employees. He has asserted that various co-workers have said that Garay had a history of hiring young women who "looked good in a flight suit," Am. Compl. ¶ 71, ECF No. 17, but he has provided no admissible evidence to establish that point. Likewise, although he claims that Garay was known to have called Schindler his "girl-toy," he has not offered any firsthand witness to support that allegation. Davis does assert that Garay met with Schindler frequently and that he saw her car outside his office at times, but he has not offered evidence to connect this fact to gender bias.

Second, with respect to alleged disparate treatment, Davis claims that the contract photographers received more and better flight assignments than they were supposed to, because he was supposed to receive priority, followed by Wolter, then Schindler. But a log of individual flight activity from November 2011 to June 28, 2012 reveals no inappropriate discrepancy. Although Garay has acknowledged that at one point VX-23 sought to equalize the assignments to ensure that all three would have enough flight time to stay proficient, the log shows that Davis still logged 55.2 hours from November 2011 through the end of his employment, which was more than the 44.9 logged by Wolter and substantially more than the 15.9 logged by Schindler. He has not demonstrated how the fewer hours assigned to the contract photographers were qualitatively better than those assigned to Davis. In fact, specific assignments were made by VX-23 operations staff, not Garay, so he was not in a position to choose better assignments for one photographer over another.

Davis also asserts that Garay treated the contract photographers, Schindler and Wolter, more favorably because he did not discipline and counsel them for rules violations. However,

the evidence submitted on this point consisted of Wolter's statement that she was aware, from previously working with Schindler at the same contractor company, that Schindler had altered photos and used office equipment for personal business. Davis did not provide evidence that such transgressions occurred during her work for VX-23. He offered evidence that Wolter had posted a photograph to her Facebook page, presumably without getting approval to do so, but he did not provide evidence that Garay was made aware of that fact. Finally, Davis offered evidence that Schindler had skipped or been late to meetings. But Garay was not the contract photographers' supervisor and thus did not have the authority to discipline them.

Thus, at most, Davis may be able to show that Garay had a closer relationship with Schindler than with either Davis or Wolter, perhaps because, as Wolter stated, Schindler had shown when they worked together previously that she was the kind of person who would find a way to become friends with the supervisor to get better work. Garay acknowledged that he had worked with Schindler before Davis was hired, and that he considered her a "friend." Garay Dep. at 13–14. But Davis has not provided evidence to show that the closeness of that relationship was based on age or gender, or that Davis was terminated because of those factors. Particularly when Garay's first choice for the position was a man, the contractor who took over Davis's duties was a 48-year-old man, and Davis has identified no statements or actions demonstrating a bias against men or persons over age 40, Davis has not offered evidence sufficient for a reasonable jury to conclude that the stated reason for termination was a pretext for age or sex discrimination. The Court will therefore grant the Motion as to the age and sex discrimination claims.

19

### III.    Retaliation

In Count III, Davis alleges retaliation in violation of Title VII based on his assertion that he was terminated because he contacted the NAWCAD EEO Office on May 16, 2012. Under Title VII, employers are prohibited from taking adverse employment actions against employees because they oppose an unlawful employment practice. 42 U.S.C. § 2000e-3(a). A retaliation claim may be analyzed under the *McDonnell Douglas* burden-shifting framework. *See Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 550–51 (4th Cir. 2006). If Davis establishes a *prima facie* case of retaliation, the burden shifts to the Navy to show that it had a legitimate, nondiscriminatory reason for terminating him. *See id.* at 551. If the Navy makes such a showing, the burden then shifts back to Davis to show that the stated reason was pretextual and that retaliation was the "actual reason" for the termination. *See Foster v. University of Md.— Eastern Shore*, 787 F.3d 243, 253-54 (4th Cir. 2015).

### A.    *Prima Facie* Case

A *prima facie* case of retaliation requires a showing that the plaintiff (1) engaged in a protected activity; (2) the employer took an adverse action against the plaintiff; and (3) the adverse action was causally connected to the protected activity. *Yashenko*, 446 F.3d at 551. The Navy acknowledges that Davis has satisfied the first two prongs, but disputes that his termination was causally connected to contacting the EEO Office on May 16, 2012. Causation must be established at two stages of the *McDonnell Douglas* framework: first, in making a *prima facie* case, and second, in proving pretext and satisfying the ultimate burden of persuasion. *Foster*, 797 F.3d at 250. The difference between the two stages is that the burden for establishing causation at the *prima facie* stage is "less onerous." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989)). At this stage, causation may be proven by the proximity between when the

20

protected activity took place and when the employee was terminated. *See id.* ("Appellant's proof of a causal connection between the protected activity and her discharge essentially was that she was fired after her employer became aware that she had filed a discrimination charge. While this proof far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality.").

In this case, Garay terminated Davis on June 28, 2012, approximately six weeks after Davis contacted the NAWCAD EEO Office on May 16, 2012. Garay was notified of the EEO contact on June 11, 2012, when he received an e-mail from the EEO counselor. Notably, three days after receiving this e-mail, on June 14, 2012, Garay approved a letter to terminate Davis. On June 19, 2012, Garay wrote in an e-mail to Schindler, who had asked for clarification after hearing a reference to Davis as a team lead, that "no one is a team lead or supervisor here." Schindler E-mails at 2. Then on June 25, 2012, the door to the building in which Davis worked, which had always been unlocked, was for the first time locked so that Davis could not gain entry without the assistance of a security guard. Viewed in the light most favorable to Davis, the proximity between when Garay learned of Davis's EEO contact and Davis's ultimate termination, combined with the several actions in the interim that appear to undermine Davis, satisfies the "less onerous" burden for establishing causation at the *prima facie* stage. *See Williams*, 871 F.2d at 457.

### B. Nondiscriminatory Reason and Pretext

Because Davis has established a *prima facie* case of retaliation, the burden then shifts to the Navy to show that it had a legitimate, nondiscriminatory reason for terminating Davis. As discussed above in relation to Davis's age and sex discrimination claims, the Navy has established such a reason—that Davis's difficulty working with others caused Garay to decide to

terminate him prior to the end of his probationary period. *See supra* part II.B.  The burden then shifts back to Davis to show that but for informally complaining to the EEO Office on May 16, 2012, the Navy would not have terminated him.  *See Univ. of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2534 (2013).  To do so, Davis must show that (1) Garay's reason for terminating him was false; and (2) retaliation for the EEO contact was the real reason for terminating him.  *See Foster*, 797 F.3d at 252.  Viewing the evidence in the light most favorable to Davis, he has not met this burden.

Davis's claim fails because documentary evidence establishes that Garay had both contemplated and decided on terminating Davis before the May 16, 2012 EEO contact, and that the decision had been fully finalized before June 11, 2012, when Garay was notified of the contact. On November 21, 2011, Garay e-mailed Jennifer Hurtt, a human resources specialist, to ask what is required "to dismiss a new employee if they're not working out within the first year of employment."  H.R. E-mails.  On April 10, 2012, after Garay had twice had in-person meetings with Davis to discuss complaints about him, Garay sent a summary of Davis's performance issues to his supervisor. Garay's supervisor responded that "I personally think we should move in another direction, but it's your call as his supervisor.  I don't like the idea of having someone around that's going to be disruptive."  Supervisor E-mails at 2.  On April 19, 2012, Garay sent another e-mail to Hurtt asking "when we can discuss Greg's employment," referring to Davis.  Counsel E-mails, Mot. Summ. J. Ex. 13, at 2, ECF No. 35-16.  The same day, Hurtt forwarded Garay's e-mail to the Labor and Employee Relations Office and stated that Garay wanted to "meet next week to discuss possibly removing the employee during their probationary period."  *Id.*  Then on May 8, 2012, Hurtt sent a follow-up e-mail to the Labor and Employee Relations Office to ask it to review the matter relating to "the probationary employee

Gerard [Garay] would like to remove." *Id.* at 4.  On May 9, 2012, the Labor and Employee

Relations Office responded and stated: "If Gerard would like to remove him draft the removal

letter and I will get it approved by the Office of Counsel." *Id.*  Then on May 14, two days before

Davis met with the EEO counselor, Hurtt sent to that office a draft "letter to remove Mr. Greg

Davis while in his probationary period." *Id.* at 5.  On June 8, 2012, Hurtt e-mailed to Garay the

final termination letter, noting that "the date at the top of the letter will need to be changed to

reflect the date that you issued the letter to him" and asking Garay to "ensure that I receive a

copy of the signed letter." Termination E-mails, Mot. Summ. J. Ex. 16, ECF No. 35-19.

Given this timeline, no reasonable jury could find that the termination was retaliation for

Davis's informal EEO complaint.  As of June 11, 2012, the date that Garay was notified of the

EEO contact, the termination letter had already been finalized.  All that needed to be done was

for Garay to present the letter to Davis and obtain his signature.  Because that meeting did not

occur until June 28, 2012, Garay was aware when he presented the letter that Davis had made an

informal EEO complaint.  However, "mere knowledge on the part of the employer that an

employee it is about to fire has filed a discrimination charge is not sufficient evidence of

retaliation to counter substantial evidence of legitimate reasons for discharging that employee."

*See Williams*, 871 F.2d at 457.

Although Davis asserts that Garay must have known of the EEO contact prior to June 11,

2012, he has presented no evidence to support that allegation.  Even if Garay had learned earlier,

the e-mails plainly establish that Garay decided to terminate Davis, and the Navy had already

drafted a letter to effect that termination, before Davis made his informal EEO complaint on May

16, 2012.  No reasonable jury could conclude that, at such a late stage in the termination process,

23

Davis's EEO contact, even if immediately conveyed to Garay, was a but-for cause of his termination.

In the face of this evidence, Davis points to Garay confronting Davis by e-mail on May 15, 2012 to allege that he had improperly released a photograph. However, the complete exchange shows that Garay was acting in response to an April 27, 2012 e-mail from the NAWCAD Communications Director, who had reported that a different employee had identified the apparent violation of policy. Moreover, Garay raised the issue with Davis on May 15, 2012, *before* Davis contacted the EEO office. Davis also references Garay's June 19, 2012 e-mail to Schindler that "no one is a team lead or supervisor here." Schindler E-mails at 2. However, that message was in response to an inquiry from Schindler, not an edict issued by Garay without reason. Such evidence is insufficient to create a genuine issue of material fact in favor of Davis on the issue of causation.

Finally, in his Memorandum in Opposition to the Motion for Summary Judgment, Davis for the first time claims that Garay retaliated against him for contacting an EEO counselor on February 27, 2012. "It is well-established that parties cannot amend their complaints through briefing." *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. Openband at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013). In Davis's Amended Complaint, he makes no mention of contacting the EEO Office in February 2012. The first contact he reports is "[o]n or around May 16, 2012, Plaintiff filed an EEO Complaint for age and sex discrimination and a hostile work environment." Am. Compl. ¶ 119. Davis cannot at this late stage, after discovery is complete and in response to a Motion for Summary Judgment, raise an additional retaliation claim based on a different set of facts. *See Southern Walk*, 713 F.3d at 184. For this reason alone, the Court will not consider a retaliation claim based on a February 2012 EEO contact.

In any event, Davis has not presented any evidence that Garay was aware of Davis's February 2012 contact with the EEO Office at any time before June 11, 2012, when the EEO counselor e-mailed him to notify him that Davis contacted the EEO Office on May 16, 2012. Davis's deposition testimony that he "believed" Garay knew that he contacted the EEO in February, but he didn't "know for sure," Davis Dep., Mot. Summ. J. Ex. 4, at 96–97, ECF No. 35-7, is insufficient to create a genuine issue of material fact, particularly where documentary evidence establishes that the first discussions relating to possible termination of Davis date back to November 2011, three months earlier. The Court therefore grants the motion for summary judgment on the retaliation claim.

## CONCLUSION

For the foregoing reasons, the Navy's Motion for Summary Judgment is GRANTED. A separate Order shall issue.


Date:  February 11, 2016

THEODORE D. CHUANG
United States District Judge